LAW OFFICES OF ANDREA MARCUS
Andréa Marcus (SBN 188098)
andrea@andreamarcuslaw.com
Lyndsey A. Gallagher (SBN 284293)
lyndsey@andreamarcuslaw.com
133 East De La Guerra St., #143
Santa Barbara, CA 93101
Telephone: (888) 215-9021
Fax: (888) 215-9021
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUSTAVO CORTES<br><br>                    Plaintiff,<br><br>          v.<br><br>KERN COUNTY SUPERINTENDENT OF SCHOOLS<br><br>                    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: *TBA*<br>COMPLAINT<br><br>1)  For Attorneys' Fees as Prevailing Party in a Due Process Hearing Under 20 U.S.C. § 1415(i)(3) and Cal. Educ. §56507, and for fees and costs associated with the matter before this Court |

Plaintiffs, for a claim for relief against defendant, alleges as follows:

## INTRODUCTION

1. Invoking the Court's jurisdiction pursuant to 20 U.S.C. § 1331, plaintiffs file this action to recover reasonable attorneys' fees and expenses incurred in connection with an

1

administrative proceeding under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (hereinafter, "Cortes").

## JURISDICTION AND VENUE

2. This action arises under the laws of the United States. Jurisdiction is conferred on this Court pursuant to 20 U.S.C. § 1415(i)(3) and 28 U.S.C. § 1331.

3. Venue is proper in this court under 28 U.S.C. § 139l(b). The defendant resides within the Eastern District of California and all of the events which are the subject of this complaint took place within the Eastern District of California.

## PARTIES

4. Plaintiff Gustavo Cortes (hereinafter "Parent") is the parent of A.C., a minor child (hereafter A.C. or "Student"), who is a student with disabilities within the meaning of the IDEA.

5. Defendant Kern County Superintendent of Schools (hereafter "Superintendent") is a public entity organized  and existing under the laws of the State of California. Pursuant to the Constitution and laws of the State of California, defendant Superintendent has a duty to provide a free and appropriate public education (FAPE) to all children residing within its jurisdictional boundaries. Pursuant to IDEA, it also has the duties set forth  in paragraphs 6 through 8, below.

2

## STATUTORY SCHEME UNDER IDEA

6. IDEA is the successor to the Education for all Handicapped Children Act ("EHCA"), which was adopted in 1975 to ensure that children with disabilities receive an appropriate public school education. In amending IDEA in 2004, Congress found that when EHCA was enacted, the educational needs of literally "millions" of children with disabilities were not being met because "they did not receive appropriate educational services" or "were excluded entirely from the public school system and from being educated with their peers." 20 U.S.C. § 1400(c)(2)(A) and (B). Although it found that progress had been made, Congress further found that the implementation of IDEA "has been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." 20 U.S.C. § 1400(c)(3) and (4). Congress also found that the education of disabled children can be more effective by providing for appropriate special education and related services, and aids and supports in the regular classroom to such children whenever "appropriate." 20 U.S.C. § 1400(c)(5)(D). Congress therefore re-enacted IDEA in order, among other things, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and to prepare them for

3

employment and independent living" and "to ensure that the rights of children with disabilities and their parents are protected." 20 U.S.C. § 1400(d)(l)(A) and (B).

7. Defendant Superintendent is responsible for providing the free and appropriate education required by IDEA to eligible students residing within its boundaries. Defendant Superintendent is the "local educational agency" responsible for serving Plaintiff's daughter, within the meaning of 20 U.S.C. § 1401(19).

8. Pursuant to 20 U.S.C. § 1415(b)(6)(A), "[a]ny party" may present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of [a] child, or the provision of a free appropriate education to such child," and have the complaint resolved in an impartial due process hearing. At all times relevant hereto, California had established an impartial  due process hearing system with hearings conducted by the California Office of Administrative Hearings ("OAH").

9.  20 U.S.C. § 1415(i)(3)(B) provides that in an action or proceeding brought under Section 1415, the court may in its discretion award reasonable attorneys' fees  as part of the costs to the parents of a child with a disability who is the prevailing party.

///

///

4

Gustavo Cortes  v. Kern County Superintendent of Schools

Plaintiff's Complaint for Attorneys' Fees and Costs

## CLAIM FOR RELIEF

10. On March 30, 2016, Plaintiffs filed a complaint for due process and requested an administrative hearing in accordance with the procedures authorized by 20 U.S.C. § 1415(b)(6)(A) and in accordance with the procedures of OAH to determine whether Defendant had procedurally and substantively violated the IDEA resulting in a denial of a free and appropriate public education ("FAPE") to A.C. during the applicable statutory period.

11. OAH conducted a hearing on June 9, 10, 13 and 14, 2016 in Bakersfield, California. OAH issued its decision on August 8, 2016, a copy of which is attached hereto as Exhibit A.   Specifically, the Plaintiff prevailed on the two issues heard:

   a.      Did Superintendent deny Student a free appropriate public education by failing to initiate a due process hearing between September 1, 2014, and April 11, 2016, to establish that it offered Student an appropriate placement? And,

   b.      Did Superintendent's September 24, 2014, October 30, 2014, November 9, 2014, January 26, 2015, and May 27, 2015, individualized education programs deny Student a FAPE by failing to offer an appropriate placement through April 11, 2016?

12.  At hearing, Plaintiff argued that Superintendent procedurally denied Student a FAPE by failing to initiate a hearing when Parents did not consent to the September 24, 2014, October 30, 2014, November 9, 2014, January 27, 2015, and May 27, 2015 IEP's,

Gustavo Cortes  v. Kern County Superintendent of Schools
Plaintiff's Complaint for Attorneys' Fees and Costs

offering to place Student in a home schooling placement at Superintendent's Valley Oaks Charter School. Student further contended that Superintendent substantively denied her a FAPE by offering Valley Oaks' home schooling placement at each IEP team meeting, knowing that Parents were ineffective teachers.

13.     Defendant contended it was not required to request a hearing, because it had signed master agreements between Parents and Valley Oaks, placing Student in the independent study, home schooling program. Superintendent further contends that Valley Oaks offered Student an appropriate placement so long as Parents fulfilled all of their responsibilities as Student's primary educators in the home pursuant to the master agreements signed by Valley Oaks, Parents and Student.

14.     The Administrative Decision held that Student prevailed on both issues. Superintendent was required to initiate a hearing when Parents refused to provide written consent to the September 24, 2014, October 30, 2014, January 26, 2015, and May 27, 2015 IEP's. Superintendent denied Student a FAPE by offering an inappropriate home schooling placement at each IEP team meeting.  Superintendent knew that Student was historically and actively psychotic with a serious emotional disturbance. Superintendent knew at all relevant times that the home schooling placement, where Parents provided educational services as the primary educators for several years, did not provide Student with educational benefit. Student requires a residential treatment center for at least six

Gustavo Cortes  v. Kern County Superintendent of Schools
Plaintiff's Complaint for Attorneys' Fees and Costs

months to address her educationally related social, emotional, and behavioral issues.

15.    Plaintiffs retained the Law Offices of Andréa Marcus to represent their interests in connection with the due process proceedings, and Ms. Marcus & Mr. Kaeser represented Plaintiffs at the due process hearing.

16. Because Plaintiffs were the prevailing parties with respect to the core issue in the due process proceedings, Plaintiffs are entitled to their reasonable attorneys' fees and expenses in connection therewith. The amount of said fees and expenses are not less than $169,235.00, to the recovery of which Plaintiffs are entitled together with interest thereon as provided by law.

## ATTORNEYS' FEES AND EXPENSES

17. Plaintiffs are also entitled to their reasonable attorneys' fees in connection with bringing this action pursuant to 20 U.S.C. § 1415. As of this writing, the amount thereof is undetermined.

## REQUEST FOR RELIEF

Plaintiffs respectfully request the following relief:

1. Reasonable attorneys' fees and expenses incurred in the administrative proceeding in the total amount of not less $169,235.00.

7

Gustavo Cortes v. Kern County Superintendent of Schools
Plaintiff's Complaint for Attorneys' Fees and Costs

2. For interest thereon as provided by law.

3. For costs, disbursements, and reasonable attorneys' fees in bringing and prosecuting this action.

4. For such other relief as may be just and proper.


Dated: April 13, 2017                              Respectfully submitted,


Law Offices of Andréa Marcus

By: Andréa Marcus

8

EXHIBIT A



State of California  •  Government Operations Agency
Edmund G. Brown, Jr., Governor
## Department of General Services

General Information: (916) 376-5000

# Fax Coversheet

**Date:** 08/08/16                                    **Time:**  8:27 am

**To:**  Andrea Marcus
**Fax number:** 18882159021

**From:**  Kent, Stefanie@DGS

**Subject:**  {Matter No.[2016040211]}{CORTES, ANGELICA}

**Number of pages:** 30

Decision

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>PARENT ON BEHALF OF STUDENT,<br><br>v.<br><br>KERN COUNTY SUPERINTENDENT OF SCHOOLS. | OAH Case No. 2016040211 |

## DECISION

On April 11, 2016, Student filed a request for a due process hearing with the Office of Administrative Hearings, naming the Kern County Superintendent of Schools. OAH granted a continuance for good cause on May 27, 2016.

Administrative Law Judge Caroline A. Zuk heard this matter in Bakersfield, California, on June 9, 10, 13 and 14, 2016.

Andréa Marcus, Attorney at Law, represented Student, assisted by Kelly Kaeser, Attorney at Law. Father attended the entire hearing. Mother and Student were not present at the hearing. A Spanish language interpreter was available on June 9 and 10, 2016 to interpret for Mother. The ALJ released the interpreter after the second day of hearing upon mutual agreement by the parties' attorneys, because neither attorney intended to call Mother as a witness and she did not attend the hearing.

Kelly Lazerson, Attorney at Law, represented Superintendent, assisted by Elizabet Rodriguez, Attorney at Law, and Darren Bogié, Attorney at Law. Superintendent's Principal, Shirden Prince, was present for the entire hearing.

At the conclusion of the hearing, the matter was continued to July 13, 2016 to file written closing briefs. The record was closed on July 13, 2016, when the parties filed closing briefs and the matter was submitted for decision.

ISSUES[1]

1.      Did Superintendent deny Student a free appropriate public education by failing to initiate a due process hearing between September 1, 2014, and April 11, 2016, to establish that it offered Student an appropriate placement?

2.      Did Superintendent's September 24, 2014, October 30, 2014, November 9, 2014, January 26, 2015, and May 27, 2015, individualized education programs deny Student a FAPE by failing to offer an appropriate placement through April 11, 2016?

SUMMARY OF DECISION

Student contends that Superintendent procedurally denied her a FAPE by failing to initiate a hearing when Parents did not consent to the September 24, 2014, October 30, 2014, November 9, 2014, January 27, 2015, and May 27, 2015 IEP's, offering to place Student in a home schooling placement at Superintendent's Valley Oaks Charter School.  Student further contends that Superintendent substantively denied her a FAPE by offering Valley Oaks' home schooling placement at each IEP team meeting, knowing that Parents were ineffective teachers.

Superintendent contends it was not required to request a hearing, because it had signed master agreements between Parents and Valley Oaks, placing Student in the independent study, home schooling program.  Superintendent further contends that Valley Oaks offered Student an appropriate placement so long as Parents fulfilled all of their responsibilities as Student's primary educators in the home pursuant to the master agreements signed by Valley Oaks, Parents and Student.

Student prevailed on both issues.  Superintendent was required to initiate a hearing when Parents refused to provide written consent to the September 24, 2014, October 30, 2014, January 26, 2015, and May 27, 2015 IEP's.  Superintendent denied Student a FAPE by offering an inappropriate home schooling placement at each IEP team meeting. Superintendent knew that Student was historically and actively psychotic with a serious emotional disturbance.  Superintendent knew at all relevant times that the home schooling placement, where Parents provided educational services as the primary educators for several years, did not provide Student with educational benefit.  Student requires a residential treatment center for at least six months to address her educationally related social, emotional, and behavioral issues.

---

[1] Student clarified on the record at hearing that the case was limited to these two issues.  Student served her corrected due process complaint on April 8, 2016, and filed it with OAH on April 11, 2016.  Accordingly, the correct date of filing is April 11, 2016.

FACTUAL FINDINGS

*Jurisdiction*

1.      Student, age 17 years and seven months, resides with her parents within the boundaries of the Tehachapi Unified School District. From the time she was five or six years old, Student has suffered from schizophrenia manifested by auditory, visual, and olfactory hallucinations. At the time of hearing, she was eligible for special education as a child with an emotional disturbance.

2.      In August 2013, Student enrolled in the 10th grade at Valley Oaks Charter School in Tehachapi, a dependent charter school authorized by Superintendent. Superintendent became Student's district of service replacing Tehachapi as the local educational agency.

*Valley Oaks Charter School*

3.      Valley Oaks serves over 1,200 students, grades kindergarten through 12, in Bakersfield, Frazier Park, Lake Isabella, Taft and Tehachapi. Valley Oaks grew out of a need in Kern County to provide an accountable, parent-choice, parent-participation, independent study, home schooling program. Valley Oaks provides supports for parents and students, including curriculum, instructional materials, credentialed general and special education teachers, enrichment classes, study hall periods, tutoring, teacher appointments, and progress monitoring.

4.      Valley Oaks also provides special education services, relying upon Superintendent for qualified personnel, such as special education teachers, school psychologists, speech and language therapists, and mental health professionals.

*Master Agreements Between Valley Oaks and Parents*

5.      Parents voluntarily chose to enroll Student at Valley Oaks, because of their personal preference for a home-schooling program.

6.      At the beginning of each fall and spring semester, Valley Oaks required all participating parents to sign a master agreement with it, detailing the respective responsibilities of Valley Oaks, parents, and students in the independent study, home-schooling program. Parent and Valley Oaks executed master agreements for the 2014-2015 school year on September 2, 2014, and December 17, 2014, for the first and second semesters, respectively.

7.      Valley Oaks agreed to assist parents who are committed to participating in the education of their own children so that the students will make adequate and appropriate progress toward the attainment of the California State Standards. It also agreed to provide resources including, but not limited to, resource teacher(s), textbooks, selected materials,

field trips, multimedia, workshops, and enrichment classes on campus.  It also agreed to evaluate and report upon Student's progress, and provide credits upon satisfactory work completion.

8.      Parents agreed pursuant to the master agreements to provide direct instruction to Student, Monday to Friday, for four to six hours per day, assuming responsibility as Student's primary general education teachers.  Parents and Student agreed to be responsible for keeping all appointments with the special education teacher, and submitting completed, reviewed, and corrected original work on or before the date due.  The master agreements did not include Superintendent's offer of a FAPE for Student.

*October 1, 2013 IEP Team Meeting*

9.      On October 1, 2013, Superintendent conducted an annual IEP team meeting. Father attended along with all required staff.  Student was eligible for special education, because of an emotional disturbance.  Superintendent offered its independent study, home schooling program, and special education and related services.  Father provided written consent to the entire IEP at the conclusion of the meeting.

10.     The October 1, 2013 IEP was Student's operational IEP at the beginning of the 2014-2015 school year.  The IEP included four to six hours per school day of home-based, direct instruction in the general education curriculum by Parents; and six and one-half hours per week of general education enrichment classes, such as biology, math, and world history, taught by credentialed general education teachers in a small classroom setting at Valley Oaks' campus in Tehachapi.  The IEP also included 30 minutes weekly of specialized academic instruction consultation services by a special education teacher; four hours and 20 minutes per month of counseling services and 60 minutes per month of social work services provided by Kings View, a contracted non-public agency.

*March 2014 Settlement Agreement (10th Grade)*

11.     On March 18, 2014, the parties executed a settlement agreement in the matter of *Kern County Superintendent of Schools v. Student*, OAH Case No. 2014030100, relating to Student's special education at Valley Oaks during 10th grade.  The agreement resolved all claims relating to Student's special education through the end of the 2013-2014 school year.

12.     Parents agreed that Valley Oaks' independent study, home schooling program offered Student an appropriate education through the end of the 2013-2104 school year. Parents agreed to ensure Student's participation in the program, including attending the optional enrichment classes on Tuesdays and Thursdays, accompanied by Mother or another adult family member.  Parents agreed that Superintendent could conduct a functional behavior assessment of Student.

*May 13, 2014 Functional Behavior Assessment*

13.     Superintendent's school psychologist, Jennifer Cothern, conducted a functional behavior assessment, resulting in a report dated May 13, 2014.  Ms. Cothern has nearly seven years of experience as a credentialed school psychologist in public school settings.  The target behaviors for the assessment were Student's poor work completion and elopement from Valley Oaks' general education enrichment class on Thursdays.  The elopement behavior resolved when Parent started to accompany Student to the enrichment class.  However, work completion continued to be a concern.  Student had only earned 7 out of 52 potential credits from the time she enrolled in Valley Oaks on August 19, 2013.

14.     Ms. Cothern considered multiple sources of data to analyze Student's poor work completion.  These sources included review of records; interviews of Student, Parents, and teachers; three observations of Student on April 10, 2014 in Valley Oaks' general education enrichment classes; three home observations on April 21, April 23and May 2, 2014, and a reinforcement inventory completed by Student.  During the school observations, Mother was present, functioning as Student's one-to-one aide.  During the home observations, Mother was present, functioning as Student's teacher.  During the observations, Student demonstrated appropriate work habits, including following directions, participating in class discussions, taking notes, completing quizzes, and completing assignments.  Student did not demonstrate maladaptive behaviors with Mother's support.

15.     Ms. Cothern concluded that Student was a "dependent learner," requiring adult supervision and prompting to complete assignments.  Ms. Cothern's assessment did not explain why Student struggled with work completion prior to the assessment.  Her assessment did not consider how Student's emotional disturbance affected her ability to independently access instruction and complete assignments.  Ms. Cothern did not recommend a behavior support plan, because Student did not demonstrate problematic behaviors with Mother's assistance.  Ms. Cothern placed the burden of educating Student primarily on Parents, recommending four to six hours of daily instruction from them with supports from Valley Oaks to promote assignment completion and mastery of grade level skills.

*2014-2015 School Year* (11th grade)

16.     On August 18, 2014, Valley Oaks began its first day of instruction for the 2014-2015 school year.  As referenced above, on September 2, 2014, Parent and Valley Oaks signed a master agreement, which was the first day of Student's attendance and enrollment at Valley Oaks.  Student began the 2014-2015 school year, using the October 1, 2013 IEP as the last agreed upon and implemented IEP.

17.     On September 9, 2014, Father provided written consent for Superintendent to conduct a speech and language assessment, and a psychoeducational assessment to investigate Father's concern that Student might have autism.

18.     The IEP team convened several times during the 2014-2015 school year to discuss Student's placement.

*September 24, 2014 Annual IEP Team Meeting*

19.     The IEP team convened on September 24, 2014 at Valley Oaks' Tehachapi campus to conduct Student's annual review.  The IEP team included Father, Ms. Cothern, and all required staff.  Superintendent's attorney also attended the meeting.  Father actively participated in the meeting.  The IEP team concluded that Student continued to be eligible for special education under the eligibility category of emotional disturbance.

20.     Student's strengths included average range intelligence, academic potential to graduate with a high school diploma, artistic abilities, and age appropriate motor skills and self-help skills.  Student's areas of need were emotional functioning, behavior, and social skills.

21.     The IEP team acknowledged Student's history of schizophrenia, including auditory and visual hallucinations, depression, and threats of harm to herself, expressed in disturbing verbalizations, written messages, and cartoon drawings.  Student was moody, angry, sad, and frustrated during home instruction.  She felt overwhelmed with assignments, had difficulty concentrating, and became easily frustrated when presented with work. Mother spent most of the home schooling instructional time trying to calm Student's emotions so that she could start her work.  Despite Parents' attempts to implement accommodations and provide encouragement, they were not successful in improving Student's mood, dominated by anger, and increasing Student's time on task.  Father hoped Student's new prescribed medications would stabilize her mood.

22.     Student rarely attended the optional general education enrichment classes at Valley Oaks' campus, which were available on Tuesdays and Thursdays.  Between September 2 and 24, 2014, Student only attended one class for English, biology, US history, and algebra 1.  As of the IEP meeting, she had turned in no homework for English, US history, and biology, and had only completed one biology assignment.  Consequently, Student was failing her classes, and not on a pathway to earning the 143 credits she needed to graduate high school.

23.     Student did not have the ability to complete work independently.  Her output improved if an adult sat next to her but she still was not sufficiently productive to satisfy the demands of her classes.  Superintendent partially attributed Student's work incompletion to a lack of motivation.  Student alienated peers and teachers by disclosing bizarre and, at times, macabre thoughts, visions, and drawings.  She tended to be withdrawn, using minimal speech to interact with teachers.

24.     Student's emotional, behavioral, and social challenges adversely affected her education, such that she was unable to access the general education curriculum, and maintain social relationships with peers and teachers.  The IEP team members, including Father,

6

shared deep concerns about Student's inability to complete assignments but disagreed on how to support her.

25.     Father requested three revisions to the IEP.  First, he requested that Superintendent assign an aide to accompany Student to the enrichment classes, because Student performed better with an adult next to her.  Superintendent agreed that Student performed better with one-to-one assistance but did not offer to assign an aide.  Instead, Superintendent encouraged Mother to serve as Student's aide during the enrichment classes, because Student performed better when Mother accompanied Student to school. Superintendent also reminded Father that, per the master agreement, Parents or another adult family member were responsible for being Student's primary instructor, and serving as Student's one-to-one support.

26.     Second, Father requested that the IEP team explore other placement options, including local residential programs, and Superintendent facilitated a helpful discussion regarding other options.  The IEP team discussed the option of a half-day, classroom-based, credit recovery program at Tehachapi Unified School District's Monroe Continuation High School, and a special day class with built-in supports for students with emotional disturbances at Tehachapi High School.  Considering that Student had started new medications, and it was too early to know if the medications would help to stabilize her mood, Superintendent offered to explore other options while Student adjusted to her medications.  The parties agreed that Student's placement should be close to her home in Tehachapi.

27.     Because Student was overwhelmed with the volume of work, Father requested a 50 percent reduction in assignments, reasoning that it may motivate Student to attend the enrichment classes and complete her assignments at home.  Superintendent explained that if Father wanted Student to earn a high school diploma, Student needed to complete all of the expected coursework.  However, Superintendent was open to accommodating a reduced workload so long as Student extended the time to complete her courses, resulting in a postponed graduation date.  Superintendent also explained that if Student needed a shorter school day and reduced workload for medical reasons, then Parents would need to provide Superintendent with a medical doctor's note.

28.     Superintendent offered to place Student in Valley Oaks' general education, independent study, home schooling program, beginning September 25, 2014 through September 24, 2015.  Parents were responsible for creating and implementing this placement by providing four to six hours of daily instruction in the home.  Student's placement was 100 percent in general education.

29.     Superintendent provided Parents with detailed information on Valley Oaks' home schooling program.  Superintendent explained that it was a non-traditional approach to independent study where parents are fully responsible for being a student's primary teachers; how the educational team works with parents to support the program; and how curriculum,

IEP accommodations and modifications, and strategies are implemented by the parents with guidance from Valley Oaks' staff.

30.     Superintendent offered special education services to support Student's home schooling placement.  The services consisted of 30 minutes weekly of specialized academic instruction consultation by a special education teacher; two hours per month of individual educationally-related mental health counseling provided off site by Kings View; one hour and 20 minutes per month of observations by Kings View staff to support individual counseling sessions; 20 minutes per month of social work service consultative services by Kings View; and 45 minutes per month of parent and family counseling in the home to support behavior implementation strategies.

31.     Superintendent knew that Student was not receiving benefit from the home schooling placement.  Parents were ineffective teachers, because they did not have the expertise to address Student's social, emotional and behavioral deficits.  Parents could not fulfill the responsibility of being Student's primary teachers.  On an interim basis for two weeks after the IEP meeting, Superintendent offered four, 90-minute sessions of one-to-one tutoring at Valley Oaks by Student's general education teachers.  The tutoring provided Student with additional support, pending a follow-up IEP meeting when the IEP team would explore further placement options.

32.     Father did not consent to the IEP except for the updated mental health services.  Superintendent continued to implement Student's October 1, 2013 IEP, except for the agreed upon mental health services.

*October 2014 Assessments for Suspected Autism*

33.     Rhonda Taylor conducted a speech and language assessment and prepared a report dated October 13, 2014.  Ms. Cothern conducted a psychoeducational assessment and prepared a report dated October 15, 2014.  Ms. Cothern's assessment relied, in part, on Ms. Taylor's behavioral observations of Student.

34.     Ms. Cothern evaluated whether Student had communication, social, and behavioral characteristics of autism.  The test results revealed that Student's social skills were below average as compared to similar aged peers.  Problem areas included not asking for help from adults, not making friends easily, and not taking responsibility for her actions.

35.     Ms. Cothern did not observe Student at home or at Valley Oaks between September 24 and October 30, 2014, as part of her assessment of behavioral functioning. However, testing revealed that Father rated Student as having significant behavioral deficits; the teachers' ratings did not.

36.     Ms. Cothern's report incorporated the following helpful behavioral observations from Ms. Taylor's speech and language assessment.  Student was noticeably withdrawn, and was not an interactive participant in the assessment process.  Student offered

no verbal information without prompting; attended to visual stimuli only when directed; did not initiate conversation; did not attempt to direct the flow of conversation; and did not make eye contact. Student's mental health challenges significantly impacted her performance during the assessment. Student showed no desire to make her true communication abilities known. At hearing, Father corroborated Ms. Taylor's findings, observing that Student was withdrawn, and communicated minimally at home.

37.     Ms. Cothern's assessment results revealed that Student's communication, social and behavioral deficits were not consistent with autism but rather were manifestations of Student's emotional disturbance.

*October 30, 2014 IEP Team Meeting*

38.     The IEP team reconvened on October 30, 2014 to review the results of Ms. Cothern's and Ms. Taylor's assessments, and continue discussions regarding Student's program. All required IEP team members were present, including Father. The IEP team concluded Student continued to have needs in the areas of emotional functioning, behavior, and social skills.

39.     Student had not attended any enrichment classes at Valley Oaks after September 24, 2014. Student's medications had recently changed, resulting in aggressiveness at home. Parents were ineffective teachers, because they did not have the expertise to address Student's social, emotional and behavioral deficits.

40.     Superintendent knew that Student was not accessing the curriculum and earning credits toward graduation, and recognized that the IEP team needed to explore placement options other than Valley Oaks' home schooling program. Accordingly, the IEP team discussed five placement options: (1) Monroe Continuation High School's home study program; (2) Monroe's classroom program; (3) East Kern Community School's independent study program; (4) East Kern Community School's classroom program; and (5) Tehachapi Unified School District's self-contained, special education classroom for students with emotional challenges at Tehachapi High School.

41.     Monroe's home study program, like Valley Oaks', relied on parents to educate students. Monroe, unlike Valley Oaks, did not offer any general education enrichment classes or any special education support. Monroe's classroom program helps general education students who are credit deficient. The program requires students to attend classes on campus in the morning, and complete a higher volume of work than traditional high school to earn credits at an accelerated pace. The IEP team appropriately rejected both of these placement options, because Student needed more, not less, supports, and her emotional and behavioral challenges impeded her ability to attend classes and complete assignments at a regular pace.

42.     East Kern Community School's independent study program requires students to attend classes on campus for at least three to four hours per week, and complete

9

assignments at home.  East Kern's classroom program requires students to attend classes every day, and complete assignments at home.  The IEP team rejected these options for the same reasons it rejected the Monroe options.

43.     Tehachapi's self-contained, special day class for students with emotional challenges is a full-day program from 7:30 a.m. to 3:30 p.m.  A credentialed special education teacher oversees the program with the assistance of classroom aides to supervise and support the students, then 14.  The class has a classroom-based behavior management system with rewards.  Staff provided small-group instruction, implemented accommodations and behavior strategies to increase time on task, and monitored and supported the students' emotional and behavioral needs throughout the day, including access to individual mental health services.  The self-contained setting increased opportunities for building peer relationships, and decreased opportunities for eloping.

44.     Student's IEP team knew that Student was not benefiting from her then-current home-study placement at Valley Oaks.  They also knew that Student needed to receive daily instruction from a credentialed special education teacher in a structured classroom environment with built-in supports to address Student's needs.  The IEP team recommended placement in the special day class at Tehachapi High School.

45.     At the IEP meeting, Father expressed his willingness to consider the special day class as a placement option.  However, at hearing, Father was adamant that he would "never" agree to place Student in that classroom, because he did not think it was safe, and he believed that Tehachapi staff had retaliated against Student and Father.  The IEP notes reflected multiple concerns expressed by Tehachapi Unified School District staff about Student's return to its school, including Student's history of poor attendance and elopement there, and a complaint Father filed against the school district with the California Department of Education.  No one from Tehachapi Unified School District testified at hearing.

46.     In addition to placement, the parties discussed Father's previous request for a 50 percent reduction in the volume of work.  Father was unable to get a doctor's order requiring a shorter school day.  In the absence of a doctor's order, the IEP team did not make any changes to the volume of Student's work or the length of her school day.

47.     The IEP team, including Father, also discussed Student's educationally-related mental health services, and agreed that the level of services offered at the September 24, 2014 IEP team meeting continued to be appropriate for Student.

48.     Soon after the October 30, 2014 IEP team meeting, Superintendent and Valley Oaks learned that Tehachapi Unified School District would not accept Student into the proposed special day class at Tehachapi High School while she was enrolled at Valley Oaks.  Superintendent recommended another IEP team meeting to continue to discuss placement options.  Student's placement continued to be Valley Oaks' independent study, home schooling program based upon the October 1, 2013 IEP.

*November 9, 2014 Interim Offer*

49.     Superintendent knew based on the discussions during the September and October 2014 IEP team meeting and Student's very poor academic output that Parents could not meet Student's unique needs in the then-current home schooling placement.  On November 9, 2014, Superintendent presented Parents with an interim written offer of placement and services without a formal IEP team meeting.  Superintendent proposed the interim offer, because Parents could not meet Student's needs at home, and Student could not attend Tehachapi Unified School District while enrolled at Valley Oaks.

50.     The interim proposal offered the independent study, home schooling program, requiring Parents to provide at least two hours of instruction per day.  It also offered two hours per day of specialized academic instruction at Valley Oaks by a special education teacher; two hours per month of individual counseling services, provided off site by Kings View; one hour and 20 minutes monthly of Student observations by Kings View to support the individual counseling sessions; 20 minutes per month of social work services by Kings View, consisting of consultations with staff; and 45 minutes per month of parent and family counseling in the home to support Parents' implementation of behavior strategies.

51.     Parent provided written consent to the entire interim offer.  The parties agreed to convene an IEP team meeting to discuss an appropriate placement for Student.

*Apex Program*

52.     Superintendent implemented the November 9, 2014 interim offer until the next IEP team meeting.  The interim program was an improvement over the home-based program, because of the structure and direct, individual, specialized instruction available through the daily tutoring sessions at Valley Oaks with Brian McFarland, a veteran, credentialed special education teacher.

53.     In the meantime, Student started a new, on-line, credit recovery program called Apex, beginning November 13, 2014.  The parties agreed to limit Student's entire course load to only biology.  Student accessed Apex at Valley Oaks and at home.  Her proposed schedule was two hours in the morning at Valley Oaks with Mr. McFarland's specialized instructional support, and two to four hours per day at home with Parents' lay instructional support.

54.     In November 2014, Student attended 9 out of 10 instructional days before the Thanksgiving holiday.  In December 2014, Student attended 14 out of 15 instructional days before the winter break.  In January 2015, Student attended 8 out of 16 instructional days before the January 26, 2015 IEP team meeting.  Student's attendance improved compared to the previously implemented home-based program.  Father's and older brother's consistent transportation of Student to and from Valley Oaks, and the daily structure of a school-based program, contributed to the improvement.

11

55.     Student completed more assignments during the interim program than during the home-based program given a daily schedule at Valley Oaks, and Mr. McFarland's specialized instruction and supervision of Student's program in a one-to-one setting. She demonstrated the ability to complete grade level work. In early December 2015, she scored 100 percent and 90 percent on two Apex quizzes. However, Student's work completion still fell far short of the pace required to earn credits to graduate with a diploma in June 2016. Student also completed the minimal amount of work, resulting in grades well below her potential.

56.     Student's social-emotional functioning was inconsistent. In November and early December 2015, she interacted positively with Mr. McFarland and made eye contact with him. Between December 9 and 19, 2015, Student started to have nightmares, and felt "terrible" at school. On December 18, 2015, Student drew people hung by a noose in the margins of her school notes.

57.     Student's grades at the end of the fall semester for the 2014 – 2015 school year were all "F's."

58.     In January 2015, Student's attendance, work completion, and social-emotional functioning declined compared to November and early December 2014. Student still suffered from nightmares and felt terrible at school. On January 12, 2015, she informed Valley Oaks' Principal Deanna Downs that she wanted to kill herself. Student subsequently denied feeling suicidal after school staff notified Parents, Kern County's Sheriff's Department, and Child Protective Services. Student's older sister escorted her home, followed by two deputy sheriffs. The event upset Student, Valley Oaks staff, and Parents. Student did not attend school between January 13 and 26, 2015, because Parents did not trust Valley Oaks staff.

*January 26, 2015 IEP Team Meeting*

59.     The IEP team reconvened on January 26, 2015, to continue discussions regarding Student's program. Father, Ms. Cothern, and all required staff members attended the meeting. Superintendent's attorney also attended.

60.     The IEP team discussed Student's response to the split-day schedule between Valley Oaks and home, using the Apex program. At hearing, Mr. McFarland opined that Student's program was appropriate because Student attended school, engaged with him, and made some academic progress, even though it was slow. While Student's attendance and work habits initially improved given a consistent schedule, and specialized academic instruction from Mr. McFarland, a highly experienced and caring teacher, Student was making minimal progress towards earning a diploma. Student's work completion significantly impacted her academically, pushing her further behind in meeting the graduation requirements. Student underwent medication adjustments, and she continued to suffer from nightmares. Student's significant emotional challenges directly and adversely affected her ability to benefit from academic instruction.

61.     Superintendent offered its independent study, home schooling program, requiring Parents to provide two to four hours per day of instruction.

62.     As to services, Superintendent offered two hours per day of specialized academic instruction at Valley Oaks by a special education teacher, then Mr. McFarland; implementation of the Apex program; collaboration between home and school to facilitate consistent strategies across settings, including parent participation during Student's sessions at Valley Oaks; 200 minutes per month of individual counseling, consisting of two hours per month of individual counseling services by Kings View; and one hour and 20 minutes per month of Student observations by Kings View to support the individual counseling sessions; and parent and family counseling in the home, 200 minutes per month.

63.     Superintendent continued to offer a program requiring that Parents provide the majority of instruction to Student at home.  The IEP team reminded Parents of their responsibilities as the primary teachers in the home school environment.  Parents did not provide written consent to the January 26, 2015 IEP.  Superintendent's November 2014 interim offer remained the IEP in effect.

64.     As of the conclusion of the January 2015 IEP team meeting, Superintendent knew that Parents were not effective instructors, and did not have the expertise to address Student's academic, social, emotional, and behavioral needs.

*Student's Academic Progress Between January 27, 2015 and May 27, 2015*

65.     After the January 26, 2015 IEP team meeting, Student only attended two tutoring sessions on January 27 and February 2, 2015.  Student's new medication regime caused drowsiness.  On February 11, 2015, Father informed Valley Oaks that Student would not be attending the tutoring sessions.  Parents attempted to implement the Apex program at home.  Student minimally accessed the program between February and May 2015.

66.     On May 4, 2015, Father requested an IEP team meeting to discuss Student's program, because he remained concerned that her then-current program was not appropriate. Father also requested independent educational evaluations to challenge Ms. Cothern's psychoeducation assessment and Ms. Taylor's speech and language assessment, completed in October 2014.

*May 27, 2015 IEP Team Meeting*

67.     The IEP team reconvened on May 27, 2015, one day before the end of the 2014-2015 regular school year.  Father, Student's advocate Vikki Rice, Superintendent's and Valley Oaks' attorney, and all required staff were present at the meeting.

68.     The IEP team reviewed the placement options previously discussed during the October 2014 IEP team meeting, including the option of Student disenrolling at Valley Oaks, and reenrolling in Tehachapi Unified School District where Student would be able to receive

a full day special education program.  Father requested an aide to accompany Student to Valley Oaks' enrichment classes, and a reduction in the volume of work.

69.     Superintendent offered its independent study, home schooling program, along with the following services for the 2015 extended school year:  2 sessions per week, 140 minutes per session, of general education enrichment classes at Valley Oaks with aide support; four to six hours per day of home-based, academic instruction by Parents, using the Apex program; 200 minutes per month of individual counseling; and 200 minutes per month of parent and family counseling.  Superintendent's May 2015 IEP offer continued to require that Parents provide the majority of instruction to Student at home.

70.     Superintendent also offered to explore alternative placement options after the completion of the independent educational evaluations.  Superintendent's offer of FAPE for the 2015-2016 regular school year through September 24, 2015, the annual review date, continued to be Valley Oaks' independent study, home schooling program with two hours per week of specialized academic instruction consultation services, 200 minutes per month of individual counseling services, and 200 minutes per month of parent and family counseling.

71.     As of the May 2015 IEP team meeting, Superintendent knew that Parents were not effective instructors, and did not have the expertise to address Student's academic, social, emotional, and behavioral needs.  Parents did not provide written consent to the May 2015 IEP at the conclusion of the IEP team meeting but subsequently provided consent for only the extended school year services.

72.     Student earned only one grade, D-, in biology at the end of the spring semester for the 2014-2015 regular school year.

73.     Superintendent did not initiate a due process hearing in the absence of parental consent to establish that its IEP's dated September 24, 2014, October 30, 2014, January 26, 2015, and May 27, 2015, offered Student an appropriate placement.

*Dr. Katz's Independent Educational Evaluation*

74.     In June 2015, Superintendent granted Parents' request for an independent educational evaluation by licensed psychologist Gary Scott Katz, Ph.D.  On June 17, 2015, Father provided written consent for Dr. Katz to conduct a psychoeducational independent educational evaluation.  On June 23, 2015, Superintendent and Dr. Katz entered into a contract, providing that the evaluation would be completed by October 1, 2015.  Dr. Katz began his assessment in June and July 2015, and completed it in March 2016.  At hearing, Dr. Katz clarified that the recommendations in his March 2016 report were still appropriate for Student as of the June 2016 hearing, because her needs had not changed.

75.     Dr. Katz was highly qualified to assess Student.  He had years of education and clinical experience researching, assessing, and treating children and adults with developmental, learning, behavioral, and emotional challenges.  In 1989, Dr. Katz earned a

bachelor of arts in psychology, *magna cum laude*, from Cornell University.  In 1992 and 1998, he earned, respectively, a master of science and doctorate of philosophy in clinical psychology from the University of Pittsburgh.  His dissertation title was *Emotional Speech – A Quantitative Analysis of the Acoustics and Psychophysiology of Emotional Expression*.  Dr. Katz's clinical experience spans nearly 27 years, including assessing and treating children and adolescents with a wide range of psychopathology.  He is a licensed California psychologist, and operates a professional psychology corporation where he provides assessment and therapy services for children, adults and families.  Dr. Katz specializes in the assessment of students with serious mental illnesses in public school settings, as well as the assessment of students with attention, learning, behavioral, and psychological difficulties.  He has 18 years of experience as an associate professor of psychology at California State University, Northridge, teaching graduate students who are working toward doctorate degrees.  Dr. Katz has taught abnormal psychology, clinical psychology, advanced child psychopathology, motivation/emotion, psychological testing, and advanced inquiry in clinical psychology.  He has extensive research experience, dating back to his dissertation, on various topics, including vocal emotional expression and attention deficit hyperactivity disorder.  He has published in peer-reviewed journals, presented at professional conferences, and received numerous awards for his contributions to the field of psychology.  Dr. Katz was an expert psychologist.

76.     Dr. Katz underwent intense direct and cross-examination at hearing, testifying for a full day.  He was a credible witness.  Despite the length of his examination, he thoughtfully listened to questions, and responded directly, openly, and confidently to them.  He presented as a highly knowledgeable, confident, and caring professional who held high professional and ethical standards for his profession and himself.  Superintendent withheld payment of $4,900.00 for Dr. Katz's assessment, because he was unable to complete it by October 2015 due to delays caused by Father.  Nevertheless, Dr. Katz completed the assessment and wrote a helpful, detailed report, placing the mental health needs of Student above his own personal financial gain.  His insightful analysis of the contours of Student's severe emotional disturbance illuminated Student's complex, educational needs.

77.     Dr. Katz's assessment consisted of record review, clinical observations of Student during nine hours of one-to-one testing over two days, clinical interview of Student, Parent interviews, and administration of 12 tests.  The tests were: *Achenbach Child Behavior Checklist, Achenbach Youth Self Report, Beck Anxiety Inventory, Beck Depression Inventory, Second Edition, Beck Hopelessness Scale, Gilliam Autism Rating Scale, Third Edition, Millon Adolescent Clinical Inventory, Minnesota Multiphasic Personality Inventory, Adolescent Edition, Social Communication Questionnaire, Symptom Checklist 90, Revised, Wechsler Intelligence Scale for Children, 5th Edition, and Woodcock-Johnson Tests of Achievement, 4th Edition*.

78.     There were limitations to Dr. Katz's assessment.  He did not observe Student at home or Valley Oaks.  He did not receive a complete copy of Student's school records from Father.  He did not obtain input from Student's teachers through rating scales or direct

15

communications with them.  Dr. Katz did not complete his report until March 2016, because Father delayed in returning the protocol for the *Gilliam Autism Rating Scale*.

79.     Father did not authorize Dr. Katz to release his March 2016 assessment report until the parties proceeding to hearing.  Father did not disclose the report because he did not trust Superintendent and wanted to wait for the results of an independent speech and language evaluation.  Student relied on Dr. Katz's assessment to support her proposed remedy in this hearing of placement in a residential treatment center.

80.     When Dr. Katz assessed Student on June 11 and 24, 2015, Student was actively psychotic, because of schizophrenia and ineffective medical management of her symptoms.  She was on several prescribed medications to treat low mood, obsessive thoughts, strange sensory experiences and beliefs, and sleep problems.  Dr. Katz expressed deep concern regarding the quality of Student's psychiatric care.  While Dr. Katz was not authorized to prescribe medications, he knew based on his experience working in clinical settings and collaborating with medical doctors on cases, that schizophrenia's symptoms could be better managed with proper medications.  Dr. Katz was deeply concerned that Student was, and continued to be, actively psychotic.  In Dr. Katz's credible opinion, Student should not be actively psychotic, given proper medical and therapeutic interventions.

81.     As to Student's cognitive abilities, on the *Wechsler Intelligence Scale for Children, 5th Edition*, she obtained a full scale intelligence quotient score of 80 which was in the low average range.  In contrast, eight years prior when she was in the fourth grade, she obtained average to above average standard scores on the Cognitive Assessment System, administered by Temecula Valley Unified School District.  While a comparison of scores suggested a decline in Student's intellectual abilities, Student was actively psychotic during Dr. Katz's assessment, and on multiple medications.  Therefore, it could not be determined if Student had, in fact, experienced a true decline in cognitive functioning.  Dr. Katz credibly opined that he would expect Student to perform better on a standardized test of cognition after stabilization of her active psychosis.

82.     As to Student's academic functioning, Dr. Katz opined that Student had a specific learning disability, affecting mathematics.  Student's ability to perform in the average range on certain subtests, considering her serious emotional challenges, was commendable and consistent with her teachers' opinions that she has the ability to complete grade level assignments.  Dr. Katz credibly opined that he would expect Student to perform better on a standardized test of academics after stabilization of her active psychosis.

83.     As to Student's social functioning, Dr. Katz's findings were based on his clinical observations of Student, interviews with Parents, and the results of rating scales completed by Parents and two of Student's siblings.  While Dr. Katz did not obtain information from Valley Oaks staff, Student's interactions with him during the one-to-one testing sessions were similar to her interactions with Ms. Taylor and Mr. McFarland during their one-to-one sessions with her.  Student talked in a low voice with flat affect, limited her eye contact, and used as few words as possible for required verbal responses even when

16

asked to elaborate her responses. Dr. Katz did not find that Student was autistic, consistent with Ms. Cothern's October 2014 assessment.

84.     As to Student's emotional functioning, Dr. Katz's assessment provided excellent insight into the seriousness of Student's emotional disturbance. Dr. Katz credibly opined at hearing that Student was "not on the same planet that we are on," and was not able to learn, given her mental illness.

85.     Student's schizophrenia emerged around age five or six years of age when she reported seeing faces or hearing voices coming from television or computer screens in her home. Student's multiple medications did not effectively manage symptoms of her schizophrenia during the 2014-2015 school year, including hallucinations, depression and anxiety.

86.     The results of several measures of emotional functioning revealed the seriousness of Student's emotional disturbance. Student's scores on standardized measures of psychological and psychiatric concerns were highly elevated, indicating concerns with obsessive thoughts and compulsive behaviors, anxiety, paranoid ideation, and psychotic symptoms. Her responses indicated a high degree of symptom severity.

87.     On the *Beck Depression Inventory, 2nd Edition,* Student's score indicated moderate concerns with depression. Student did not report any suicidal ideation but reported feeling severe levels of failure as a person, guilt, and self-blame. Student also felt that she was being punished. On the *Beck Hopelessness Scale*, which analyzes the potential for suicidal acts, Student's score suggested mild concerns with hopelessness.

88.     On the *Multiphasic Personality Inventory, Adolescent Edition*, which measures personality and psychological functioning, Student endorsed visual, auditory, and olfactory hallucinatory experiences. Student's responses also revealed significant concerns with bizarre thoughts, social alienation, persecutory ideas, and feelings of being controlled by others. Student's responses also indicated anhedonia, meaning a lack of pleasure in daily life.

89.     On the *Millon Adolescent Clinical Inventory*, another measure of personality and psychological functioning, Student reported having a significantly poor self-image, high levels of anxiety, marked feelings of distress and fear of reaching out. She felt actively rejected by peers and humiliated by this rejection.

90.     Student's hallucinations frightened her, because she heard and saw dead people. She coped by not talking about her hallucinations, withdrawing, and suffering quietly. Student's active psychotic symptoms were not obvious to peers or teachers, because of Student's closed-off, non-communicative manner.

91.     Dr. Katz's findings regarding Student's social-emotional functioning were consistent with Superintendent's general statements of Student's present levels. Dr. Katz's

assessment provided more detail and insight regarding Student's emotional disturbance than Student's IEP's, Ms. Cothern's testimony, and Ms. Cothern's May and October 2014 assessments.

92.       Superintendent did not call any of Student's direct mental health service providers to challenge Dr. Katz's analysis of Student's emotional disturbance and its adverse effect on her education.  Therefore, Dr. Katz's findings and expert opinion regarding Student's needs and placement were credible and persuasive.  Dr. Katz's assessment confirmed that Student had serious social, emotional, and behavioral problems, which directly and adversely affected her educational performance during the 2014-2015 and 2015-2016 school years.

93.       Given the seriousness of Student's emotional disturbance, affecting her academic achievement, social-emotional development, and behavior, Dr. Katz opined that Student needs a placement where a professional team, experienced in educating students with severe mental illnesses, can coordinate intensive, round-the-clock interventions to address her educational, psychological, and psychiatric needs.  Student first needs "reactive" medical and psychological interventions to address her active psychosis, followed by "proactive" psychological and educational interventions once stabilized.  Dr. Katz credibly opined that Student's medical, psychological, and educational needs were interrelated.

94.       Dr. Katz persuasively opined that Student needed a placement, consisting of these key elements:  a residential treatment center to address Student's psychiatric, psychological, and educational needs where Student would feel safe and nurtured; on-site staff, including medical, mental health, and educational professionals who are trained to work with actively psychotic, severely mentally ill students; access to immediate interventions, 24 hours per day, to address Student's mental health symptoms; individual and small group counseling/psychotherapy; social skills training; and transition planning.

95.       Dr. Katz estimated that Student's active psychosis could be stabilized by proper medications within weeks with daily monitoring and support.  Following medical stabilization, he estimated that Student's response to psychotherapy would produce improvements in approximately four months.  Given an intensive, structured, highly monitored, round-the-clock support in a therapeutic residential setting, Dr. Katz anticipated that Student would be able to return to her home-schooling program after intensive, integrated interventions.  Dr. Katz recommended that planning for Student's transition back to a less restrictive setting should begin as soon as Student entered a residential treatment center.  Dr. Katz did not recommend a particular residential treatment center, and deferred the selection of an appropriate placement to a separate search process.

*2015-2016 School Year (12th Grade)*

96.       Superintendent developed IEP's on September 24, 2015, November 30, 2015, and December 10, 2015, continuing to offer the same independent study program with related services and supports, similar to the IEP's discussed above.  Superintendent

maintained its position that these IEP's offered an appropriate education as long as Parents fulfilled their teaching responsibilities. Superintendent knew that Parents remained ineffective teachers during the 2015-2016 school year.

97.     Student continued to suffer from the debilitating symptoms of her emotional disturbance. Consequently, she rarely accessed Apex at home, and rarely attended school at Valley Oaks.

98.     Student did not earn a diploma in June 2016, because she still needed 133 credits to graduate. As of April 20, 2016, her class rank was 64 out of 64 students.

## LEGAL AUTHORITY AND ANALYSIS

*Introduction – Legal Framework under the IDEA[2]*

1.     This hearing was held under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations intended to implement it. (20 U.S.C. § 1400 et seq.; 34 C.F.R. § 300.1 (2006)[3] et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.) The main purposes of the IDEA are: (1) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living, and (2) to ensure that the rights of children with disabilities and their parents are protected. (20 U.S.C. § 1400(d)(1); see Ed. Code, § 56000, subd. (a).)

2.     A FAPE means special education and related services that are available to an eligible child at no charge to the parent or guardian, meet state educational standards, and conform to the child's individualized education program. (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.) "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.) "Related services" are transportation and other developmental, corrective and supportive services that are required to assist the child in benefiting from special education. (20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, § 56363, subd. (a) [In California, related services are also called designated instruction and services].) In general, an IEP is a written statement for each child with a disability that is developed under the IDEA's procedures with the participation of parents and school personnel that describes the child's needs, academic and functional goals related to those needs, and a statement of the special education, related services, and program modifications and accommodations that will be provided for the child

---

[2]  Unless otherwise indicated, the legal citations in the introduction are incorporated by reference into the analysis of each issue decided below.

[3]  All subsequent references to the Code of Federal Regulations are to the 2006 version.

to advance in attaining the goals, make progress in the general education curriculum, and participate in education with disabled and non-disabled peers.  (20 U.S.C. §§ 1401(14), 1414(d)(1)(A); Ed. Code, §§ 56032, 56345, subd. (a.).)

      3.      In *Board of Education of the Hendrick Hudson Central School District v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] (*Rowley*), the Supreme Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to a child with special needs.  *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers.  (*Id.* at p. 200.)  Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is reasonably calculated to "confer some educational benefit" upon the child.  (*Id.* at pp. 200, 203-204.)  The Ninth Circuit Court of Appeals has held that despite legislative changes to special education laws since *Rowley*, Congress has not changed the definition of a FAPE articulated by the Supreme Court in that case.  (*J.L. v. Mercer Island School Dist.* (9th Cir. 2010) 592 F.3d 938, 950 [In enacting the IDEA 1997, Congress was presumed to be aware of the *Rowley* standard and could have expressly changed it if it desired to do so.].)  Although sometimes described in Ninth Circuit cases as "educational benefit," "some educational benefit" or "meaningful educational benefit," all of these phrases mean the *Rowley* standard, which should be applied to determine whether an individual child was provided a FAPE.  (*Id.* at p. 951, fn. 10.)

      4.      The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i).)  Subject to limited exceptions, a request for a due process hearing must be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request.  (20 U.S.C. § 1415(f)(3)(C), (D); Ed. Code, § 56505, subd. (l).)

*Burden of Proof*

      5.      At the hearing, the party filing the complaint has the burden of persuasion by a preponderance of the evidence.  (*Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA administrative hearing decision is preponderance of the evidence].)  As the petitioning party, Student has the burden of proof by a preponderance of the evidence on all issues in this case.  (*Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [163 L.Ed.2d 387].)

*Charter Schools*

6.      Children with disabilities who attend public charter schools and their parents
retain all rights under the IDEA and its regulations.  (34 C.F.R. § 300.209(a).)  A charter
school that is a public school of a local educational agency must serve children with
disabilities attending those charter schools in the same manner as the LEA serves children
with disabilities in its other schools.  (*Id.*, subd. (b)(1)(i).)

7.      A public charter school that authorizes independent study by a student must
have in place every semester a written independent study agreement.  (Ed. Code, § 51747,
subd. (c).)  The agreement must be signed by the student, and, if the student is under 18 years
of age, by the parent, guardian or caregiver.  (*Id.*, subd. (c)(8).)  The agreement must contain,
among other things, the "specific resources, including materials and personnel, that will be
made available to the pupil."  (*Id.*, subd. (c)(3).)  However, the Legislature did not intend that
these statutes override or conflict with special education law.  Education Code section 47646,
subdivision (a), provides in pertinent part that a child with disabilities attending a charter
school shall receive special education instruction "in the same manner as a child with
disabilities who attends another public school of that local educational agency."  It also
imposes on the chartering LEA the duty to ensure that "all children with disabilities enrolled
in the charter school receive special education ... in a manner that is consistent with their
individualized education program" and is in compliance with the IDEA and its regulations.
(*Ibid.*)

*Issue 1:  Failure to Initiate a Due Process Hearing*

8.      Student contends that Superintendent denied her a FAPE by failing to initiate a
due process hearing between September 1, 2014 and April 11, 2016 to establish that it
offered her an appropriate placement.  Superintendent contends it was not required to file for
due process because it had a written agreement between Parents and Valley Oaks placing
Student in the independent study program.

APPLICABLE LAW

9.      When a parent refuses to consent to the receipt of special education and
services, after having consented in the past, California law requires that the school district
seek resolution of the impasse by filing a request for a due process hearing.  If the parent or
guardian of a child who is an individual with exceptional needs refuses all services in the
individualized education program after having consented to those services in the past, the
local educational agency shall file a request for due process   (Ed. Code, § 56346, subd. (d).)
If a parent consents to some but not all of a proposed program, the district must implement
only those portions to which the parent has agreed so as not to delay providing instruction
and services to the child.  (Ed. Code, § 56346, subd. (e).)  If the local educational agency
believes that the components of the IEP to which the parent will not consent are necessary to
provide the student a FAPE, it must seek an order from an ALJ to that effect in accordance
with title 20 United States Code section 1415(f).  (Ed. Code, § 56346, subd. (f).)  The

mandatory duty of a district to seek a due process hearing was recently confirmed by *I.R. v. Los Angeles Unified School Dist.* (9th Cir. 2015) 805 F.3d 1164, 1169-1170.

ANALYSIS

10.     Superintendent conducted Student's annual review IEP team meeting on September 24, 2014, and continued discussions regarding placement and services on October 30, 2014, November 9, 2014, January 26, 2015, and May 27, 2015.  Consistent with Parents' personal preference for an alternative educational program, Superintendent offered to place Student in Valley Oaks' independent study, home schooling program, beginning September 25, 2014 through September 24, 2015.  Parents did not sign the IEP's, except for the interim offer, dated November 9, 2014, which was effective until the January 26, 2015 IEP offer.

11.     Superintendent argued that it relied, in lieu of a signed IEP, on the executed master agreements with Valley Oaks from September 2, 2014, and December 17, 2014, granting permission for Student to enroll in its independent study, home schooling program. Pursuant to these agreements, Parents assumed the responsibility of creating and implementing Student's general education placement in their home, four to six hours per day. Parents' written consent was in effect at the time of the September 24, 2014 IEP offer, and throughout the first semester of the 2014-2015 regular school year.  However, Superintendent offered no evidence that the master agreements incorporated any of the services, supports or accommodations from Superintendent's IEP offers.

12.     The lack of a signed IEP that offered an appropriate placement triggered Superintendent's duty to file for due process.  Notwithstanding the signed master agreements, Superintendent knew that the home schooling placement was inappropriate, because Parents were not effective teachers.  Superintendent's reliance on the existence of the master agreements denied Student a FAPE, because the master agreements between Valley Oaks and Parents did not relieve Superintendent of its responsibility to offer Student an appropriate placement on an IEP.  Student's remedies will be discussed below.

*Issue 2:  Failure to Offer an Appropriate Placement*

13.     Student contends that her needs were not met in Valley Oaks' home schooling placement, that Superintendent knew that Parents were unable to implement the home schooling program, and that Superintendent continued to offer its home schooling placement even though they knew it was not appropriate for Student.

14.     Superintendent contends that Parents knowingly and voluntarily enrolled Student in a home schooling placement, and agreed to be Student's primary instructors. Superintendent contends that the home schooling placement was appropriate for Student so long as Parents provided four to six hours of daily instruction, and Parents and Student fully availed themselves of the special education services and mental health services offered by Superintendent through the master agreements.

22

APPLICABLE LAW

15.     In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program. (*Gregory K. v. Longview School Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.)  A school district is not required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student. (*Ibid.*)  For a school district's offer of special education services to a disabled pupil to constitute a FAPE under the IDEA, a school district's offer must be designed to meet the student's unique needs, comport with the student's IEP, and be reasonably calculated to provide the student with some educational benefit in the least restrictive environment. (*Ibid.*)  Whether a student was offered or denied a FAPE is determined by looking to what was reasonable at the time the IEP was developed, not in hindsight. (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149, citing *Fuhrman v. East Hanover Board of Education* (3rd Cir. 1993) 993 F.2d 1031, 1041.)

16.     An educational placement means that unique combination of facilities, personnel, location or equipment necessary to provide instructional services to an individual with exceptional needs, as specified in the IEP in any one or a combination of public, private, home and hospital, or residential settings.  The IEP team shall document its rationale for placement in other than the school and classroom in which the pupil would otherwise attend if the pupil were not handicapped.  The documentation shall indicate why the pupil's handicap prevents his or her needs from being met in a less restrictive environment even with the use of supplementary aids and services. (Cal. Code Regs., tit. 5, § 3042.)  The IEP team shall consider the strengths of the child, the concerns of the parents for enhancing the education of their child, the results of the initial or most recent evaluations of the child and the academic, developmental and functional needs of the child. (34 C.F.R. § 300.324 (a).)  The IEP team shall consider whether or not the child needs assistive technology services and devices. (34 C.F.R. §300.324 (a) (v).)

17.     An agency cannot eschew its affirmative duties under the IDEA by blaming the parents. (See *Anchorage School Dist. v. M.P.* (9th Cir. 2012) 689 F.3d 1047, 1055. "[P]articipating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents.")  See also *W.G. v. Board of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1485, holding that the school district could not blame parents' choice to leave an IEP meeting for its own failure to create an IEP with the participation of the appropriate parties.  If a parent refuses to attend or is entirely unresponsive to the agency's requests to meet, the agency has a duty to move forward with the IEP process. (*K.D. v. Department of Education* (9th Cir. 2011) 665 F.3d 1110, 1124.)

ANALYSIS

18.     As of the September 24, 2014 IEP team meeting through April 11, 2016, Superintendent knew that Student suffered from schizophrenia, that she had unique needs in the areas of social-emotional functioning and behavior, and that her serious emotional

challenges directly and adversely affected her ability to access the general education curriculum.  Superintendent knew that Parents were not effective instructors, and did not have the expertise to address Student's needs.  There was no dispute that Student's home schooling placement was not providing Student with educational benefit.

19.    During the October 30, 2014 IEP team meeting, Superintendent appropriately recommended that Student attend a special day class for students with emotional challenges at Tehachapi High School in Tehachapi Unified School District.  However, soon after the IEP team meeting, Superintendent revoked its offer for a special day class when it learned that Tehachapi Unified School District was unwilling to educate Student so long as she was enrolled at Valley Oaks.  Parents refused to withdraw Student from Valley Oaks, and re-enroll Student in her local school district, because Parents did not trust Tehachapi.

20.    When Superintendent learned that Tehachapi was not willing to serve Student so long as she was enrolled at Valley Oaks, Superintendent's duty was to search and offer another special day class that could meet Student's needs.  Instead, Superintendent continued to offer its home schooling placement, knowing that it was not benefitting Student.  Whether or not Parents were reasonable in refusing to consider a special day class setting for Student at Tehachapi High School, Superintendent knew that Student suffered, languishing for months in a home schooling placement it knew was not benefitting her.

21.    Superintendent's position that Student's home schooling placement was appropriate so long as Parents fulfilled their responsibilities pursuant to the master agreements is contrary to special education law.  California law does not permit a charter school's independent study agreements to override a local educational agency's duty to provide a FAPE.  California Education Code section 47646, subdivision (a), provides in pertinent part that a child with disabilities attending a charter school shall receive special education instruction "in the same manner as a child with disabilities who attends another public school of that local educational agency."

22.    Superintendent had a duty to ensure that the full range of placement options was available to Student.  Instead, Superintendent limited placement options to only one, home schooling, deferring to Parents' preference.  Superintendent attempted to bolster the ineffectiveness of the home schooling placement with special education services and mental health services by adding services to IEP offers that Parents declined to sign.

23.    Parents were not experts in special education.  Whether or not they refused to consider one of the placement options offered at the IEP meetings during the 2014-2015 school year did not relieve Superintendent of its responsibilities.  Superintendent had the duty to ensure that Student received a FAPE, not Parents.  Superintendent abdicated its responsibilities to educate Student by shifting the burden to Parents.

24.    Student's needs were not met in Superintendent's home schooling placement at Valley Oaks, even with special education services and mental health services.  Dr. Katz's credible testimony established Student was seriously mentally ill during the time period

relevant to this matter.  Student needed a placement specifically designed to serve students with emotional disturbances in order to allow her to obtain any educational benefit from her educational program.  Superintendent denied Student a FAPE by offering Student an inappropriate home schooling placement.

## REMEDIES

1.      Under federal and state law, courts have broad equitable powers to remedy the failure of a school district to provide FAPE to a disabled child.  (20 U.S.C. § 1415(i)(1)(C)(iii); Ed. Code, § 56505, subd. (g); see School Committee of the Town of Burlington, Massachusetts v. Department of Education (1985) 471 U.S. 359, 369 [105 S.Ct. 1996, 85 L.Ed.2d 385].)  ALJ's in special education cases have broad equitable powers.  (Forest Grove School Dist. v. T.A. (2009) 557 U.S. 230 [129 S.Ct. 2484, 174 L.Ed.2d 168].)

2.      School districts may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE.  (*Parents of Student W. v. Puyallup School Dist.* (9th Cir. 1994) 31 F.3d 1489, 1496 (*Puyallup*).)  The authority to order such relief extends to hearing officers.  (*Forest Grove School Dist. v. T.A.* (2009) 557 U.S. 230, 243-244, fn. 11 [129 S.Ct. 2484].)

3.      When a school district denies a child with a disability a FAPE, the student is entitled to relief that is "appropriate" in light of the purposes of the IDEA.  (*School Comm. of the Town of Burlington v. Department of Education* (1985) 471 U.S. 359, 374, [105 S. Ct. 1996, 85 L.Ed.2d 385](*Burlington*); 20 U.S.C. § 1415.)  Based on the principle set forth in *Burlington,* federal courts have held that compensatory education is a form of equitable relief that may be granted for the denial of appropriate special education services to help overcome lost educational opportunity.  (See *Puyallup*, 31 F.3d 1489, 1496.)  The purpose of compensatory education is to "ensure that the student is appropriately educated within the meaning of the IDEA."  (*Id.*)

4.      Compensatory education is an equitable remedy and must rely on a fact specific and individualized assessment of a student's current needs.  (*Puyallup, supra*, 31 F.3d at p. 1496; *Reid v. District of Columbia* (D.C.Cir. 2005) 401 F.3d 516, 524 (*Reid*); *Shaun M. v. Hamamoto* (D. Hawai'i, Oct. 22, 2009 (Civ. No. 09-00075)) 2009 WL 3415308, pp. 8-9 [current needs]; *B.T. v. Department of Education* (D. Hawai'i 2009) 676 F.Supp.2d 982, 989-990 [same].)

5.      The compensatory education award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place."  (*Reid supra,* 401 F.3d at p. 524.)  In *County of San Diego v. California Special Education Hearing Office* (9th Cir. 1996) 93 F.3d 1458, the court articulated three possible tests for determining when to impose responsibility for residential placements on the special education system:  (1) where the placement is "supportive" of the pupil's education; (2) where medical, social or emotional

problems that require residential placement are "intertwined with educational problems"; and (3) when the placement is primarily to aid the student to benefit from special education. (*Id.* at p. 1468.)

6.       Student prevailed on both issues.  Student established that Superintendent denied Student a FAPE by failing to offer an appropriate placement on September 24, 2014, October 30, 2014, November 9, 2014, January 25, 2015, and May 27, 2015.  Superintendent offered Student an inappropriate placement beginning September 24, 2014 and through April 11, 2016.  Superintendent also failed to file for due process seeking an Order confirming what Superintendent believed was an appropriate IEP offer of placement.

7.       As a remedy, Student requested placement at a residential treatment center at Superintendent's expense.[4]  Student did not request a particular residential treatment center during the hearing.  She offered no evidence regarding any specific placement.[5]

8.       Student is entitled to equitable compensatory relief.  Compensatory education is awarded based upon a student's individual needs considering the individual facts of the case.  Student's complex needs present a picture of an adolescent who needs intensive intervention from a team of professionals to make educational progress.  Student has a documented history of severe emotional disturbance that made it almost impossible for her to make progress in her educational environment and required far more intervention than was ever offered by Superintendent.  In this matter, Student was denied a FAPE for almost two school years and, based upon the severity of Student's needs and the length and breadth of the denial of FAPE, Student is entitled to residential treatment to make up for this lost instruction.  Therefore, based upon Student's unique needs and the facts of this case, Student is entitled to at least six months placement in a residential treatment facility to equitably, fairly and justly compensate her for the denial of FAPE.

9.       Dr. Katz completed an individualized assessment of Student's needs that were applicable and relevant through the date of hearing.  While Father unreasonably withheld the report from Superintendent, Dr. Katz's findings regarding Student's emotional disturbance were not new to Superintendent.  Superintendent knew that Student suffered from schizophrenia, and knew or should have known the seriousness of her emotional disturbance through its own mental health service providers, Student's statements, behavior and drawings.

_____

[4]  Student attached an exhibit to her closing brief and argued for a particular residential placement based on the exhibit.  "Exhibit A" to Student's closing brief was not presented during the hearing and was not considered by the ALJ.

[5]  In closing argument, Student also requested compensatory tutoring services.  However, Student offered no evidence during hearing that supported her claims for such services, including the nature, type, duration or appropriateness of compensatory services.

10.     The fundamental difference between Superintendent's and Dr. Katz's analysis of Student's emotional disturbance was their explanation for Student's lack of progress. Superintendent blamed Parents for not implementing the home schooling program, and characterized Student as lacking motivation, requiring one-to-one supervision to complete work.  In contrast, Dr. Katz recognized that Student was seriously mentally ill, adversely affecting Student's academic performance, behavior, and social-emotional functioning.

11.     Dr. Katz credibly opined that Student requires round-the-clock intensive intervention by a team of professionals who can address her educational, social-emotional, behavioral, and psychiatric needs.  These needs are intertwined, and require the type of specialized, intensive programming available in a residential treatment center.  Dr. Katz recommended an unspecified number of weeks to stabilize Student's symptoms, including reactive mental health therapy, followed by approximately four months of intensive, therapeutic proactive interventions in a residential treatment center before Student would be ready to return to Valley Oaks.  Based on Dr. Katz's individualized assessment and expert opinion regarding Student's current needs, it is appropriate to award placement in a residential treatment center for at least six months as compensatory education.

12.     Since Student declined to propose a particular residential treatment center at hearing, Superintendent shall search for and identify an appropriate residential placement in consultation with Dr. Katz and Student's parents.


## ORDER

1.     Superintendent shall within 45 days of this decision, locate, offer and fund an appropriate residential treatment center for at least six months, unless the staff at the residential treatment center recommends an earlier or later discharge.  In the event Student is placed in the residential treatment center offered and the residential treatment center recommends an earlier or later discharge, Superintendent shall convene an IEP team meeting to consider that recommendation.  Superintendent shall invite, and fund the attendance of, a representative from the residential treatment center to participate in the IEP team meeting.

2.     The residential treatment center shall meet State standards as an educational placement for Student, and be able to provide individual counseling, small group counseling, social skills training, and transition services.

3.     The IEP team shall convene within 30 days of Student's initial enrollment at the residential treatment center to review and revise her IEP, including but not limited to present levels of performance, goals, services, supports, and accommodations to support her program at the residential treatment center.

4.     Superintendent shall fund all transportation costs associated with this placement.  This will include the cost of ensuring that Student safely travels to her placement including funding the round-trip expenses of placement staff or other professionals (up to

27

two individuals) to safely escort Student; as well as one round-trip travel during the six month period for Student to visit home; and one round-trip travel during the six month period for Parents to visit Student, including per diem meals at the State rate and reasonable lodging for two nights each trip.  If Student's placement at the residential treatment center is for longer than six months Superintendent shall fund additional transportation during Student's continued placement consistent with this Order.


## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that the hearing decision indicate the extent to which each party has prevailed on each issue heard and decided. Student prevailed on both issues.


## RIGHT TO APPEAL THIS DECISION

This Decision is the final administrative determination and is binding on all parties.  (Ed. Code, § 56505, subd. (h).)  Any party has the right to appeal this Decision to a court of competent jurisdiction within 90 days of receiving it.  (Ed. Code, § 56505, subd. (k).)


DATE: August 8, 2016

DocuSigned by:

*Caroline Zuk*

AEABE1080E8548E...
CAROLINE A. ZUK
Administrative Law Judge
Office of Administrative Hearings

# DECLARATION OF SERVICE

**OAH No. 2016040211**

I, <u>Stefanie Kent</u>, declare as follows: I am over 18 years of age and am not a party to this action.  I am employed by the Office of Administrative Hearings.  My business address is 15350 Sherman Way, Suite 300 , Van Nuys, CA  91406. On <u>August 08, 2016</u>, I served a copy of the following document(s) in the action entitled above:

## DECISION

to each of the person(s) named below at the addresses listed after each name by the following method(s):

Estela & Gustavo Cortes
200 North Mill Street #912
Tehachapi, CA  93561

Andrea M. Marcus
LAW OFFICES OF ANDREA MARCUS
133 De La Guerra Street, #143
Santa Barbara, CA  93101-2247
*CC via fax*

Kelly A. Lazerson
Attorney at Law
SCHOOL LEGAL SERVICES
1300 17th Street, 7th Floor
Bakersfield, CA  93301
*CC via fax*

☒ **Overnight Delivery.**  I enclosed the above-described document(s) in a sealed envelope or package addressed to the person(s) at the address(es) listed above, and placed the envelope or package with overnight delivery fees paid at an office or a location regularly utilized for collection and overnight delivery by an authorized overnight delivery courier.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  This declaration was executed at Van Nuys, California on August 08, 2016.

DocuSigned by:

*Stefanie Kent*

Stefanie Kent, Declarant
BC0BAA6CD487423...